BRONSTER FUJICHAKU ROBBINS
A Law Corporation

MARGERY S. BRONSTER   4750
MELINDA WEAVER            10464
1003 Bishop Street, Suite 2300
Honolulu, Hawai'i 96813
Telephone:      (808) 524-5644
Facsimile:      (808) 599-1881
Email:  mbronster@bfrhawaii.com
            mweaver@bfrhawaii.com

Attorneys for Plaintiff
KATHY RYAN INDIVIDUALLY AND IN HER
CAPACITY AS TRUSTEE OF THE BRODY
FAMILY TRUST

# UNITED STATES DISTRICT COURT

# DISTRICT OF HAWAI'I

| | |
|---|---|
| KATHY RYAN,   INDIVIDUALLY, AND IN HER CAPACITY AS TRUSTEE  OF THE BRODY FAMILY TRUST,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CHRISTOPHER S. SALISBURY, C. SALISBURY, LLC, ACCELERATED ESTATE PLANNING, LLC, CLARAPHI ADVISORY NETWORK, LLC, NATIONAL ASSET MANAGEMENT, INC., MICHAEL DIYANNI, LAKE FOREST BANK & TRUST COMPANY, N.A., WINTRUST LIFE FINANCE, | ) CIVIL NO._____<br>)<br>) **COMPLAINT; EXHIBIT "A";**<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) *(caption continued)* |

EXHIBIT A

AURORA CAPITAL ALLIANCE,          )
SECURITY LIFE OF DENVER           )
INSURANCE COMPANY, AND            )
ALEJANDRO ALBERTO BELLINI.        )
                                  )
                Defendants.       )
_____   )

## COMPLAINT

Plaintiff Kathy Ryan, by and through the undersigned counsel, individually and as Trustee of The Brody Family Trust (collectively "Plaintiffs" or "Ryan"), states and alleges as follows:

## NATURE OF THE ACTION

1.     This action seeks to stop and remedy the ongoing damages to Plaintiff as a result of Defendant Chris Salisbury's ("Salisbury") fraudulent and unlawful brokering of annuity and life insurance policies while employed by Defendants Claraphi Advisory Network, LLC, National Asset Management, Inc., Accelerated Estate Planning, LLC, and C. Salisbury, LLC.  Further, this action seeks damages against all of the Defendants for their unfair, fraudulent and unlawful acts in connection with providing Plaintiff with investment advice and/or products.  The Defendants' actions were motivated by increasing their own profits and commissions, rather than sound

investment advice to Plaintiff. As a result, Plaintiff has suffered substantial losses which could have been easily avoided.

2. Defendant Chris Salisbury served as Ryan's trusted financial advisor for over a decade, beginning in approximately 2004. During that time, among a number of other investments, Salisbury marketed and sold to Plaintiff several annuities, which have high surrender charges, and engaged in a pattern of "churning" these annuities. In other words, Salisbury directed Ryan to first purchase an annuity and then to later surrender it so that the same funds could be used to purchase yet another annuity. With each surrender Ryan incurred surrender charge penalties. Salisbury falsely claimed that those losses were worthwhile and insignificant. Meanwhile, Salisbury and his related entities received substantial commissions on these transactions while Ryan suffered considerable losses.

3. In addition to the annuity churning, around early 2016, Salisbury advised Ryan to cancel her $1,000,000 Columbus Life Flexible Premium Universal Life Insurance Policy, which she had held for approximately ten years, and to replace it because he had a better and purportedly more suitable product with VOYA Life Insurance Company. The VOYA policy had a face value of

3

$2,500,000. Salisbury advised Ryan that she needed the policy for estate planning purposes and that she personally would never have to pay a premium. Instead, the policy would be purchased through a premium financing arrangement orchestrated by Salisbury and some of the other Defendants. As Ryan's trusted financial advisor, Salisbury knew that Ryan would never be able to afford the premium payments for the policy on her own.

4. Salisbury worked with Defendant Aurora Capital Alliance to arrange for the financing of premiums to be paid to VOYA. Defendant Lake Forest Bank & Trust Company ("Lake Forest") f/k/a First Insurance Funding Corporation ("First Insurance Funding") provided the loan to cover the premiums and brokerage fee. An Irrevocable Life Insurance Trust ("ILIT") was set up and Aurora Capital hired attorney, Defendant Michael Diyanni, to serve as Trustee. Diyanni drafted and signed, as Trustee, the Trust Agreement of the Kathy Ryan Irrevocable Trust. Diyanni was paid an excessive $12,000 fee. The Defendants also directed Ryan to pledge her Allianz annuity as collateral for the loan, but assured her the premium financing arrangement would sufficiently cover the costs of the life insurance policy and she would not have to pay any costs out

4

of pocket. Ryan entered into the arrangement under the advice and counsel of Salisbury, who led her to believe the arrangement was suitable and in her financial best interests. Ryan did not know Diyanni and was not advised that he was trustee of the ILIT. Neither Salisbury nor Diyanni gave sufficient warning or explanation concerning the risks the arrangement presented to Ryan, and in particular the true degree of risk that the Allianz annuity pledged as collateral would be lost.

5. On the first anniversary of the VOYA policy, a letter was sent to Diyanni advising him that the Note was in default because an interest payment of $8,642.25 had not been made, the requisite collateral had not been provided, and the $163,500 premium payment had not been made. When Ryan learned this information, she contacted VOYA who stated that it could only speak with Diyanni. Ryan also contacted Salisbury who at first told her there had been a mistake, but later, informed her she had to immediately wire $37,000 to Lake Forest or else the company would cancel the VOYA policy and cause the surrender of her Allianz annuity. Ryan followed Salisbury's instructions in fear of incurring losses.

6. More recently, Defendants Aurora Capital Alliance, Lake Forest, and/or Wintrust Life Finance requested full surrender of Plaintiff's Allianz annuity based on a collateral assignment purportedly signed by Plaintiff. The assignment was notarized by Defendant Salisbury in California. However, Plaintiff was not in California at the time the assignment was notarized and could not have signed the document on that date. Plaintiff has contested the surrender of the Allianz annuity and alleges that her participation in the premium financing arrangement, as well as her signature on any related documents were procured through fraud.

7. Recently, Allianz filed an interpleader action in the United States District Court District of Minnesota (Case No. 0:18-cv-0229). Ryan will ask that the interpleader action be transferred to this Court and consolidated with this action.

8. Ryan, a 68-year-old retired woman, lost a substantial portion of her retirement funds because she trusted Salisbury and the Defendants, who were recommended by Salisbury. The Defendants obfuscated the reality of these investments and knowingly betrayed her trust. In doing so, the Defendants reaped

substantial monetary benefits from their acts to the extreme detriment of Ryan.

## PARTIES

9.    Plaintiff Kathy Ryan ("Ryan") is an individual residing in Lahaina, Hawaiʻi.  She brings her claims against the Defendants in both her individual capacity and as Trustee of The Brody Family Trust.

10.    Defendant Christopher S. Salisbury ("Chris Salisbury" and/or "Salisbury") is a resident of Midland, Michigan.  While serving as an investment advisor and financial planner to the Plaintiff, Salisbury was an employee of Defendant Claraphi Advisory Network, LLC, and National Asset Management, Inc., among other entities. Upon information and belief, he began working for Claraphi in approximately April 2013.  At relevant times, while transacting business as an investment advisor and financial planner to the Plaintiff, Salisbury operated under the direction and control of Defendants Claraphi Advisory Network, LLC, National Asset Management, Inc., Accelerated Estate Planning, LLC, and C. Salisbury, LLC.  Salisbury is and was at relevant times a registered Investment Adviser Representative with the Securities and Exchange

Commission ("SEC"). His CRD# is 3106247. He may be served at his business address, 7710 Mammoth Pines Dr., Midland, MI 48642-7959. Chris Salisbury, C. Salisbury, LLC, and Accelerated Estate Planning, LLC are referred to collectively in this Complaint as the "Salisbury Defendants."

11. Defendant C. Salisbury, LLC. ("C. Salisbury, LLC"), Salisbury reported to the SEC that this entity "is my business entity that all compensation or commissions are paid direct to from Claraphi, and Accelerated Estate Planning." Christopher Scott Salisbury is listed as the registered agent for this Defendant with an address for service of 24731 Clarington Drive, Laguna Hills, California, 92653. This Defendant employed Defendant Salisbury and is liable for its own acts and the acts and omissions of Defendant Salisbury.

12. Defendant Accelerated Estate Planning, LLC ("Accelerated Estate") (Westminster/Laguna Hills, CA), Salisbury reports to the SEC that he is the owner and manager of this entity which he characterizes as a "notary service" that notarizes "documents prepared by an attorney." This Defendant may be served at Legalzoom.com, Inc. c/o Joyce Yi, Sandra Menjivar, or Jessica

8

Granera 101 N. Brand Blvd. 11th Fl., Glendale, CA 91203. This Defendant employed Defendant Salisbury and is liable for its own acts and the acts and omissions of Defendant Salisbury.

13. Defendant Claraphi Advisory Network, LLC ("Claraphi") is registered with the SEC as a Registered Investment Advisor (IARD#165868) and markets itself as such. It is organized and existing under the laws of the State of Washington and is a wholly-owned subsidiary of Claraphi Capital, LLC. Claraphi may be served at its main office location, 25401 Cabot Road, Suite 214, Laguna Hills, CA 92653. Defendant Claraphi employed Defendant Salisbury and is liable for its own acts and the acts and omissions of Defendant Salisbury.

14. National Asset Management, Inc. ("NAM") is registered with the SEC as a Registered Investment Advisor (IARD#115927) and markets itself as such. It has its principal place of business at One Union Square, 600 University St., Suite 2900, Seattle, WA 98101. At relevant times, NAM also did business from its office located at 43 Corporate Park, Suite 201, Irvine, California, 92606, and may also be known as South Coast Wealth Management. Salisbury has reported to the SEC that he was employed with this Investment Advisor from

June 20, 2011 until April 30, 2013. Defendant NAM employed Defendant Salisbury and is liable for its own acts and the acts and omissions of Defendant Salisbury.

15.    Upon information and belief, Defendant Michael Diyanni ("Diyanni") is an individual residing in California.  Diyanni and his law office, the Law Office of Michael Diyanni Esq., are the current Trustees for the Kathy Ryan Irrevocable Trust.  Diyanni was hired by Aurora Capital Alliance to draft the Kathy Ryan Irrevocable Trust and was paid a $12,000 broker's fee as part of the arrangement with Defendants Lake Forest and Aurora Capital Alliance.  Diyanni may be served at the address provided on the State Bar of California's website, La Jolla Tax, 7825 Fay Ave Ste 200, La Jolla, CA 92037-4270.

16.    Defendant Lake Forest Bank & Trust Company, N.A. ("Lake Forest") is the successor-in-interest to First Insurance Funding Corporation, a/k/a. First Insurance Funding Corporation of California ("First Insurance Funding") which provided the loan to cover the premiums and brokerage fee. Upon information and belief, Defendant Lake Forest is a citizen of the State of Illinois and may be served at its main office location, 727 North Bank Lane, Lake Forest,

IL 60045. Documents relating to the Kathy Ryan Irrevocable Trust identify First Insurance Funding as a Wintrust Company, and upon information and belief, Defendant Wintrust Life Finance is a division of Lake Forest. Defendant Lake Forest is liable for its own acts, the acts and omissions of First Insurance Funding, and the acts and omissions of Defendants Wintrust, Salisbury and Diyanni.

17. Upon information and belief, Defendant Wintrust Life Finance ("Wintrust") is a division of Lake Forest. It may be served at its corporate headquarters, 101 Hudson Street, 27th Floor, Jersey City, NJ 07302. Defendant Wintrust is liable for its own acts and the acts and omissions of Defendants Salisbury and Diyanni.

18. Defendant Aurora Capital Alliance ("Aurora Capital") hired Diyanni to draft the Kathy Ryan Irrevocable Trust and arranged for First Insurance Funding (now Lake Forest) and/or Wintrust to finance the VOYA premiums. It may be served at its preferred mailing address, 2650 Camino Del Rio North, Suite 202, San Diego, CA 92108. Defendant Aurora Capital is liable for its own acts and the acts and omissions of Defendants Salisbury, Diyanni, Lake Forest, Wintrust, and/or Alejandro Alberto Bellini.

11

19. Defendant Security Life of Denver Insurance Company ("Security Life of Denver") is a corporation organized and existing under the laws of the State of Colorado and conducts business in Hawaiʻi. It may be served at its principal office mailing address, 5780 Powers Ferry Road NW, Atlanta, GA 30327. Security Life of Denver issued the VOYA IUL-Global Choice life insurance policy at issue herein. Defendant Security Life of Denver is liable for its own acts and the acts and omissions of Defendants Salisbury, Diyanni, Alejandro Alberto Bellini, and/or its appointed agents who participated in the sale of the policy.

20. Defendant Alejandro Alberto Bellini ("Bellini") is the writing agent for Ryan's VOYA IUL-Global Choice life insurance policy and participated in selling the policy to Ryan. Upon information and belief, Bellini is employed by and is the founder and/or managing partner of Aurora Capital. Upon information and belief, Bellini is an individual residing in California and may be served at the address provided on the California Department of Insurance's licensing database, 16085 San Dieguito Rd # E7 Rancho Santa Fe, CA 92067-9529.

## JURISDICTION AND VENUE

21. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists among the parties and the amount in controversy exceeds $75,000, and all other factual conditions precedent necessary to empower this Court with subject matter and personal jurisdiction have been satisfied.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendants are subject to personal jurisdiction in this district, and a substantial portion of Defendants' conduct that forms the basis of this action occurred and continues to occur in Hawai'i, including within the boundaries of this district.

## FACTUAL ALLEGATIONS

23. The Brody Family Trust was created on February 9, 1993 with Kathy Brody (Plaintiff, whose name is now "Kathy Ryan") serving as the Trustee. It was organized under the laws of California. Ryan is referred to herein, and has suffered damages, both in her individual capacity and as Trustee of The Brody Family Trust.

24. After Plaintiff's first husband passed away in 2002, the estate planning company which established The Brody Family Trust

referred Ryan to Defendant Salisbury for her investment and financial planning needs.

## The Annuity Churning Scheme

25. Early on as Ryan's financial advisor, Salisbury began investing Ryan's money and/or that of The Brody Family Trust into annuities, among other investments.

26. The Salisbury Defendants engaged in "churning" or "twisting" of these annuities by having Ryan surrender certain annuities and move the money to different annuities with the promise that any surrender fees would be offset by either bonus monies or greater earnings of the new product.

27. Annuities, such as those brokered and/or sold by the Salisbury Defendants should only be sold to consumers when they are "suitable" for the consumer's financial needs, situation, and goals.

28. Key considerations for determining whether an annuity is suitable for a client are the client's liquidity needs, the length of time they intend to hold the contract, the client's risk tolerance, and whether the product fits in the client's overall objectives, as well as consideration of other products held by the client.

14

29. In his capacity as Ryan's financial and investment advisor, Salisbury understood that Ryan did not have sophisticated knowledge of investment, financial, and insurance related matters.

30. The Salisbury Defendants took advantage of the trust Ryan placed in Salisbury, as well as Ryan's limited knowledge, by making verbal representations without providing supporting documentation about the products he was directing Ryan to invest in or purchase. He routinely presented her with signature pages, rather than complete documents, which he instructed her to sign but not date. Conveniently, Salisbury is also a licensed notary and often notarized documents that Ryan signed, including those signed outside of his presence.

31. Key among the many annuities that Salisbury churned were certain Allianz annuities, at least two of which were surrendered at a high loss.

32. First, on or about December 29, 2009, Ryan was caused to surrender Allianz Flexible Premium Deferred Annuity Policy with an Index Benefit bearing policy number XXX 3635 and a policy date of September 1, 2006. It is estimated that Ryan surrendered this

15

annuity at an approximate $200,077.00 loss. At the time of surrender, the annuity was valued at approximately $902,000.00.

33. Second, on or about November 21, 2014, following the advice and direction of Salisbury, Ryan was caused to surrender Allianz Annuity #XXX 7754. This annuity was issued on December 18, 2006.

34. Other examples of Ryan following the trusted advice and direction of Salisbury include several Phoenix Personal Income Annuities.

    a.    On December 9, 2014, Phoenix Personal Income Annuity #XXX 5109 was issued with a single premium of $24,795.55. That annuity was surrendered on or about October 19, 2017 with approximately $3,790.04 in surrender charges;

    b.    A few days later, on December 11, 2014, Phoenix Personal Income Annuity #XXX 5355 was issued with a single premium of $24,800.42, which was surrendered on or about October 19, 2017, incurring approximately $3,936.86 in surrender charges;

    c.    A few days after these two annuities were issued, Phoenix Personal Income Annuity #XXX 4609 was issued on December 18, 2014 with a single premium of $160,319.48. It was surrendered on or about November 8, 2017 incurring approximately $25,983.85 in surrender charges; and

    d.    Finally, on May 4, 2015, Phoenix Personal Income Annuity #XXX 8769 was issued with a single premium of $700,000 and was surrendered on or about November 7, 2017, incurring approximately $110,220.74 in surrender charges.

Thus, Salisbury's churning scheme cost Ryan approximately $143,931.49 as to these four Phoenix Personal Income Annuities.

35. Another example of Ryan following the trusted advice and direction of Salisbury is her purchase and investment in the Fidelity Premium Deferred Fixed Index Annuity, AdvanceMark Ultra 14, #XXX 5051 which was issued on February 8, 2015. This annuity was surrendered in or around October 2017. As of the most recent annual statement, it had an account value of approximately $453,282.53. The surrender charge was $52,382.80.

17

36.   Yet another example is the American National annuity #XXX 0431 issued on March 14, 2014 with an initial premium payment of $737,450.85.  Salisbury allowed that annuity to run just over a year before he had Ryan surrender it in or around April 2015, incurring approximately $61,028 in surrender charges.

37.   Ryan was also issued a ForeThought Single Premium Deferred Annuity Contract #XXX 8001, on February 11, 2009, with an initial premium of $166,949.80.  Ryan made several withdrawals from this annuity while it was in force at Salisbury's direction.  At the time of surrender on or about November 17, 2014, the annuity was valued at $146,486.39.  Ryan incurred a surrender fee of $7,324.32.

38.   Finally, on November 26, 2007, Ryan was issued a North American Company Individual Flexible Premium Deferred Annuity #XXX 2105 with an initial premium of $276,745.13.  Ryan paid an additional premium of $598,595.71 on or about April 27, 2012.  The annuity was surrendered for $737,450.85 on or about January 29, 2014.  The gross amount at the time of surrender was $825,656.79.  Ryan incurred a surrender charge of $111,463.67 with an interest

18

adjustment of $23,257.73; in other words, Ryan suffered a net loss of $88,205.94.

39.    The annuity transactions mentioned above in Paragraphs 31–38 are not intended to serve as an exhaustive list of every annuity or investment that Salisbury churned to Ryan's detriment.  Yet, these annuities alone cost Ryan approximately $576,207.28 in surrender charges which would not have occurred but for Salisbury's wrongful acts.   Salisbury's conduct of churning annuities owned by Ryan and/or The Brody Family Trust was ongoing during his relationship as Ryan's financial and investment advisor.

40.    Over the course of all the annuity transactions, and with respect to each, Salisbury told Ryan that the surrender of the annuity was in her best interest and explained that any surrender charge incurred was worth incurring to better position the funds in the replacement annuity.

41.    The financial planning and investment advice provided by Salisbury in connection with the annuities and other investments was fraudulent, in violation of the Hawai'i Unfair and Deceptive Acts or Practices Act, in violation of the Hawai'i Securities Act, and constituted a breach of his fiduciary duties.

19

42.  The Salisbury Defendants, NAM, and Claraphi authorized Salisbury's actions and are liable for those actions under the doctrines of respondeat superior and vicarious liability. Those Defendants also have controlling person liability, liability for failing to supervise Salisbury, and are further liable in their own right as set out herein.

## THE INSURANCE POLICIES

43.  At the advice of Salisbury, Ryan was issued a $1,000,000 Flexible Premium Universal Life Insurance Policy from Columbus Life Insurance Company valued at $1,000,000. The Policy had an effective date of May 20, 2004. Planned premiums were $16,881.12 annually.

44.  Shortly thereafter, on October 6, 2004, Ryan was also issued a Lincoln Benefit Flexible Premium Variable Life Insurance Policy at the advice of Salisbury. This policy carried a death benefit of $5,066,782. The planned annual payment was $279,731. In or around 2008, Salisbury reduced the death benefit to $500,000, and the policy was surrendered on October 7, 2013.

45.  The Columbus policy was cancelled in or around April 2016 and replaced by a $2,500,000 VOYA IUL-Global Choice Policy

20

issued by Defendant Security Life of Denver and subject to a complex financing arrangement concocted and carried out by Defendants Salisbury, Claraphi, Diyanni, Aurora Capital, Lake Forest, Wintrust, and Bellini.

46.   The VOYA policy was sold to Ryan as a product that would fund itself.  As such, Ryan was advised by Salisbury that she would never need to personally make premium payments on the policy by virtue of the design of the premium financing arrangement he, Claraphi, Diyanni, Aurora Capital, Lake Forest,  Wintrust, and Bellini had orchestrated.

47.   Like annuities, high dollar or "large case" life insurance policies should only be sold to consumers when they are "suitable" for the consumer's financial needs, situation, and goals. Moreover, premium financing arrangements for such policies should also be used only when suitable, and in particular, only when the insured can afford to pay the premiums without financing them.

48.   Ryan expressed concerns about the value of the policy to Salisbury.  Salisbury informed her that the policy was designed to assist her children in paying taxes after she died.  Salisbury did not

21

inform her, however, that very little, if any, of her net worth would be subject to estate taxes at the time the VOYA policy was purchased.

49. Upon information and belief, Salisbury misrepresented Ryan's net worth on the application for the VOYA policy.

50. The VOYA policy was not suitable for Ryan and neither was the premium financing arrangement. Ryan did not need the life insurance and, even if she did, she lacked the liquid assets to properly fund the policy. The Salisbury Defendants, Diyanni, Aurora Capital, Lake Forest, Wintrust, and Bellini knew this but induced Ryan to enter into both transactions knowing it would be to her detriment.

51. As a part of this scheme, a trust agreement was created on March 26, 2016 by a lawyer chosen by Salisbury that Ryan had never met, Michael Diyanni. Upon information and belief, Diyanni handles some tax matters but specializes primarily in personal injury and DUI/DWI cases.

52. According to a disclosure from his law office, Diyanni was also hired by Defendant Aurora Capital Alliance to draft "an Irrevocable Trust that would meet both the standards for the financial institution and life insurance carrier." In addition to

drafting the trust, Diyanni and The Law Office of Michael Diyanni would also serve as the Trustee of the Kathy Ryan Irrevocable Trust.

53.   On April 5, 2016, the VOYA IUL-Global Choice Policy was issued by Defendant Security Life of Denver.  The annual scheduled premium was $160,000, which was well over the minimum monthly premium of $3,072.22 to maintain the policy.

54.  On April 12, 2016, First Insurance Funding (now Defendant Lake Forest) issued its proposal of a $172,000 initial loan amount.  That amount included the $12,000 broker's fee that was paid to Diyanni.  The $12,000 broker's fee is substantially in excess of the commissions normally paid to brokers or agents or attorneys for similar services.

55.   Thereafter, Diyanni assigned the VOYA policy as collateral to First Insurance Funding (now Defendant Lake Forest).

56.   Ryan was also required to assign her Allianz Annual Fixed Index Annuity #XXX 9437 as collateral.  Ryan was told by Salisbury and Diyanni that the assignment would be released after seven years.

57.   However, the assignment was fraudulently procured by Salisbury and Diyanni as it is dated and notarized in Orange County,

California when Ryan was not on the U.S. Mainland and could not have signed the document.

58. During and after the sale of the policy, as Trustee of the ILIT, Diyanni failed to perform his fiduciary duties to determine the appropriateness of replacing the Columbus Life policy or the suitability of the life insurance policy. Further, Diyanni did not properly assess the negative consequences of the premium financing arrangement, the selection and assignment of collateral, and/or the funding of premiums outside of the premium financing arrangement. In short, the VOYA policy should have never been purchased.

59. A year later, Diyanni and Ryan were advised that the Note issued by First Insurance Funding (now Defendant Lake Forest) was in default for failure to make the interest payment of $8,642.25, and to make the premium payment of $163,500, as well as to provide the requisite collateral.

60. In response, Ryan contacted both VOYA and Salisbury. A VOYA representative stated the company could only speak with Diyanni as he was the "Owner" of the policy. When Ryan spoke to Salisbury, he told her First Insurance Funding was mistaken, but later reversed course and instructed Ryan to wire $37,000 to First

24

Insurance Funding and Defendant Lake Forest in order to secure the loan. Ryan wired this money but never received a receipt for her transaction.

61. Despite being told by Salisbury that Ryan would never have to personally pay premiums on the VOYA policy and that the policy would fund itself, she was also recently advised by Defendant Aurora Capital in or around March 2018 that the action items on her life insurance premium finance arrangement included an outstanding interest payment of $24,545.82 and a signed, dated Guarantors Acknowledgment and Certification Additional Collateral of $60,639.55.

62. Ryan was harmed by the purchase of the VOYA policy and the premium financing arrangement (as well as the numerous other investments that the Salisbury Defendants placed her in) because it was an unsuitable financial product in light of the excessive death benefit and premiums exceeding her ability to pay, which was known to Defendants at the time they initiated and/or approved the transaction.

63. The sale of the policy and premium financing arrangement were part of a fraudulent and deceptive scheme carried out by the

Defendants working in concert with one another. Their acts were in violation of the Hawaiʻi Unfair and Deceptive Trade Practices Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and Hawaiʻi's racketeering statute. Among other allegations set out herein, the Salisbury Defendants, Diyanni, NAM, and Claraphi's actions were also fraudulent, in breach of their fiduciary duties, and, as to the Salisbury Defendants, NAM, and Claraphi, constituted a violation of the Hawaiʻi Securities Act.

## FIRST CAUSE OF ACTION
### (Violation of the Unfair and Deceptive Acts or Trade Practices Act, HAW. REV. STAT. §§ 480-1, *et. seq.* as to all Defendants)

64.   Ryan adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

65.   By reason of the conduct and scheme described herein, Defendants have engaged in deceptive and unfair acts and practices within the meaning of HAW. REV. STAT. §§ 480-1, *et. seq.*

66.   The actions of Defendants constitute willful, malicious and egregious violations of HAW. REV. STAT. §480-2, which provides in relevant part: "Unfair methods of competition and unfair or deceptive

26

acts or practices in the conduct of any trade or commerce are unlawful."

67.   The Salisbury Defendants, NAM, and Claraphi engaged in unfair and deceptive acts and practices by the use and employment of deception, fraud, false pretenses, misrepresentation, concealment, suppression, and omission of material facts.   Specifically, while employed by Claraphi and/or NAM, Defendant Salisbury falsely represented the value of churning Ryan's annuities. While employed by Claraphi, Salisbury represented that establishing the ILIT, purchase of the VOYA policy, and the premium financing arrangement was in Ryan's best interest.  In this capacity, Defendant Salisbury also concealed substantial information from Ryan by sending her only signature pages, withholding documents, and providing little to no information about the transactions that he performed on Ryan's behalf, all while maintaining Ryan's trust.

68.   The Salisbury Defendants, NAM, and Claraphi deceived Ryan into purchasing various annuities and surrendering said annuities at high surrender charges by failing to provide Ryan with full disclosures or documentation related to the annuities and falsely representing that surrender of the annuities was in Ryan's best

27

interest, i.e. claiming that the annuities were being surrendered for a better product and that the surrender charges would be offset by the new annuity.

69.     The Salisbury Defendants, NAM, and Claraphi failed to provide reasonably adequate information about the conflicts of interest that existed among each of them and Ryan, the actual costs associated with the annuities described herein, or the VOYA policy, and failed to provide information about the inherent risks and minimal benefits of the annuities described herein or the VOYA policy.

70.     During the sale of the policy and after the sale, as Trustee of the ILIT, Diyanni concealed the fact that he had failed to perform his fiduciary duties to make an appropriate determination of the appropriateness of replacing the Columbus Life policy, or of the suitability of the life insurance policy, or the premium financing arrangement, or the selection and assignment of collateral, and/or the funding of premiums outside of the premium financing arrangement. Diyanni also concealed the fact that he was acting with a conflict of interest and was engaging in self-dealing with respect to his activities related to Ryan.

71.   During the sale of the policy, Bellini concealed the fact that he was acting with a conflict of interest and was engaging in self-dealing with respect to his activities related to Ryan as, upon information and belief, he was employed by Aurora Capital and stood to benefit from the transaction.  In his capacity as a sales agent for Security Life of Denver, Bellini also failed to make an appropriate determination about the suitability of the VOYA life insurance policy.

72.  Likewise, the other Defendants engaged in unfair and deceptive acts and practices by the use and employment of deception, fraud, false pretenses, misrepresentation, concealment, suppression, and omission of material facts.  These acts and practices include, but are not limited to:

a.   Defendant Aurora Capital engaging Defendant Diyanni to draft and serve as Trustee of the Kathy Ryan Irrevocable Trust at an excessive broker's fee of $12,000;

b.   Defendants Security Life of Denver and Bellini issuing Ryan's life insurance policy with an excessive death benefit that did not correspond to her net worth and for which she could not afford;

    c.       Defendant Salisbury misrepresenting Ryan's net worth on the application for the VOYA life insurance policy;

    d.       Defendant Diyanni drafting an illusory trust designed for his own financial benefit and that of the other Defendants;

    e.       Defendant Diyanni charging an excessive broker's fee; and

    f.       Defendants Diyanni and Salisbury requiring Ryan to sign an agreement purportedly releasing Diyanni from liability for the legal services he rendered.

    73.    Defendants committed acts of unfair and deceptive trade practices by selling and arranging the financing of the unsuitable VOYA life insurance policy.  The arrangement was inherently unfair or deceptive because it:

    a.       contained hidden charges, changing terms, and undisclosed expenses and risks; and

    b.       was unnecessarily complex in its terms to the point that no reasonable senior citizen could understand the risks and benefits of the product.

74.    The representations made by Defendants were designed to be deceptive in order to induce Ryan to enter financial transactions with Defendants as set out herein.

75.    The ultimate goal of the above conduct was to increase Defendants' profits at the expense of Ryan.

76.    Defendants' actions are in violation of HAW. REV. STAT. §§ 480-1, *et. seq.* and are continuing in nature as the financial arrangement to procure and fund the VOYA policy is still in effect.

77.    Pursuant to HAW. REV. STAT. § 480-12, the VOYA policy and the contracts associated with the funding of the VOYA policy, including any and all funding agreements with Defendants Lake Forest, Wintrust, and/or Aurora Capital and the release agreement with Defendant Diyanni, should be voided as violating HAW. REV. STAT. CHAPTER 480.

78.    In light of the foregoing, Ryan seeks treble or punitive damages, attorney's fees, and costs in accordance with HAW. REV. STAT. §§ 480-13 and/or 480-13.5 in addition to compensatory damages and any such other further relief as this Court deems just and proper, including rescission of the contracts associated with the

31

funding of the VOYA policy, rescission of the VOYA policy, and a refund of premiums plus interest.

## SECOND CAUSE OF ACTION
### (Violation of HAW. REV. STAT. § 480-2 (Suitability) as to all Defendants)

79.    Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

80.    Each of the Defendants committed acts of unfair and deceptive trade practices as defined by the Hawai'i Unfair and Deceptive Trade Practices Act, HAW. REV. STAT. §§ 480-1, *et. seq.*, as set out herein, by selling Ryan the VOYA policy and setting up the financing arrangement, both of which were unsuitable for her and The Brody Family Trust's insurance and financial needs.

81.    Defendants' actions are in violation of HAW. REV. STAT. §§ 480-1, *et. seq.* and are continuing in nature in that the financial arrangement to procure and fund the VOYA policy is still in effect.

82.    In light of the foregoing, Plaintiff seeks treble or punitive damages, attorney's fees, and costs in accordance with HAW. REV. STAT. §§ 480-13 and/or 480-13.5 in addition to compensatory damages and any such other further relief as this Court deems just

and proper, including rescission of the contracts associated with the funding of the VOYA policy, rescission of the VOYA policy, and a refund of premiums plus interest.

### THIRD CAUSE OF ACTION
### (Elder Abuse as to all Defendants)

83. Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

84. At the time the ILIT was established and the VOYA IUL-Global Choice Insurance Policy was issued, Ryan was 65 years of age and considered an "Elder" within the meaning of HAW. REV. STAT. § 480-13.5, which provides that "'elder' means a consumer who is sixty-two years of age or older."

85. Ryan was also considered an "Elder" within the meaning of § 480-13.5 at the time that Defendant Salisbury surrendered several of her annuities, including but not limited to:

a.  Allianz Flexible Premium Deferred Annuity Policy with an Index Benefit, #XXX 3635, surrendered on or about December 29, 2009;

33

b.      North American Company Individual Flexible Premium Deferred Annuity ##XXX 2105 surrendered on or about January 29, 2014;

c.      ForeThought Single Premium Deferred Annuity Contract # XXX 8001 surrendered on or about November 17, 2014;

d.      Allianz Annuity #XXX 7754 surrendered on or about November 21, 2014;

e.      American National Annuity #XXX 0431 surrendered in or around April 2015;

f.      Fidelity Premium Deferred Fixed Index Annuity, AdvanceMark Ultra 14 #XXX 5051, surrendered in or around October 2017;

g.      Phoenix Personal Income Annuity #XXX 5109 surrendered on or about October 19, 2017;

h.      Phoenix Personal Income Annuity #XXX 5355 surrendered on or about October 19, 2017;

i.      Phoenix Personal Income Annuity #XXX 8769 surrendered on or about November 7, 2017; and

j.    Phoenix Personal Income Annuity #XXX 4609

surrendered on or about November 8, 2017.

86.    Defendants' actions are in violation of the Unfair and Deceptive Acts or Practices Act, Haw. Rev. Stat. §§ 480-1, *et. seq.*, as set out herein in Paragraphs 64–82 and were directed toward, targeted, and/or injured the elderly Plaintiff with respect to all transactions taking place on or after her 62nd birthday in 2012.

87.    With respect to the VOYA policy, Defendants knew that Ryan was an elder; knew Ryan did not have the financial means to fund the life insurance policy on her own; and acted in willful disregard of Ryan's rights.

88.    With respect to the annuity churning scheme, the Salisbury Defendants, NAM, and Claraphi acted in willful disregard of Ryan's rights.    Because of his special relationship to Ryan, Salisbury knew that Ryan had limited knowledge of the financial industry and had limited understanding of the transactions that Salisbury brokered on her behalf.    Despite this knowledge and knowing that his acts were directed towards an elder, Salisbury willfully took advantage of Ryan by buying and selling annuities on Ryan's behalf that caused her to incur substantial surrender

charges. Defendants NAM and Claraphi authorized Salisbury's actions and benefited thereby.

89. Defendants' actions in violation of HAW. REV. STAT. §§ 480-1, *et. seq.* are continuing in nature in that the financial arrangement to procure and fund the VOYA policy is still in effect.

90. Because Defendants' actions were directed toward an elderly Plaintiff, Ryan seeks the higher civil penalty afforded by HAW. REV. STAT. § 480-13.5 for Defendants' violations of § 480-2 in addition to compensatory and punitive damages and any such other further relief as this Court deems just and proper, including rescission of the contracts associated with the funding of the VOYA policy, rescission of the VOYA policy, and a refund of premiums plus interest.

## FOURTH CAUSE OF ACTION
### (Fraudulent Suppression as to the Salisbury Defendants, NAM and Claraphi)

91. Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

92. As Ryan's financial advisor, Defendant Salisbury and his employers, the Salisbury Defendants, NAM, and Claraphi, were

36

under a duty to disclose certain material facts to Ryan regarding the financial transactions performed on Ryan's behalf.

93.   The Salisbury Defendants, NAM, and Claraphi suppressed the truth and failed to disclose pertinent and material facts, including but not limited to:

a.   the substantial commissions the Salisbury Defendants, NAM, and Claraphi earned from churning Ryan's annuities;

b.   the risks associated with churning annuities;

c.   that Ryan was victim of a churning scheme;

d.   the conflicts of interest existing between the seller of the annuities (the Salisbury Defendants, NAM, and Claraphi) and the purchaser (Ryan), i.e. that the primary purpose for recommending the annuities in question was to generate commissions and profits for the Salisbury Defendants, NAM, and Claraphi and that the conflicts of interests were detrimental to Ryan;

e.   the unsuitability of the VOYA policy for Ryan's financial needs;

f.   the unsuitability of replacing the Columbus Life policy;

37

g.      the risks associated with the funding arrangement of the
        VOYA policy;

h.      that neither the VOYA policy nor the annuities were
        superior to other current and/or available investment
        options;

i.      that neither the VOYA policy nor the annuities were as
        represented;

j.      that the VOYA policy and the annuities were flawed in
        design and/or were not being properly managed for the
        benefit of Ryan; and

k.      that the features and controls of the funding
        arrangement associated with the VOYA policy and the
        annuities were being manipulated to the detriment of the
        Ryan.

94.    Ryan did not know the truth and did not have the material
facts necessary to make an informed decision regarding the financial
transactions for which the Salisbury Defendants, NAM, and Claraphi
brokered on Ryan's behalf.

95.    Had Ryan known the truth, she would not have acted to
her detriment by surrendering several of her annuities at high

surrender charges in exchange for other annuities nor would she have purchased a life insurance policy greatly exceeding her needs and financial ability to pay. Ryan has suffered considerable losses.

96. The Salisbury Defendants, NAM, and Claraphi's aforementioned suppression was intentional, and if not intentional, the Salisbury Defendants, NAM, and Claraphi recklessly suppressed the truth.

97. The Salisbury Defendants, NAM, and Claraphi intended to cause damage to Ryan and to conceal their wrongdoing from her by fraudulently suppressing material facts from her. The Salisbury Defendants, NAM, and Claraphi's conduct was therefore malicious, and the Salisbury Defendants, NAM, and Claraphi are also guilty of oppression in that their systematic acts of fraud subjected Ryan to cruel and unjust hardship in conscious disregard of her rights. Ryan is therefore entitled to punitive or exemplary damages. As a direct and proximate result of the Salisbury Defendants, NAM, and Claraphi's conduct, Ryan has been damaged in an amount to be determined at trial.

///

///

## FIFTH CAUSE OF ACTION
**(Fraudulent Misrepresentation as to the Salisbury Defendants, Diyanni, NAM and Claraphi)**

98.   Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

99.   The Salisbury Defendants, NAM, and Claraphi, while serving as Ryan's investment advisor, and Diyanni, while acting as Trustee of the ILIT, misrepresented pertinent and material facts, including but not limited to:

a.      representing to Ryan that she would never have to personally pay any premiums with respect to the VOYA policy and that the policy would be funded through the premium financing arrangement and would ultimately fund itself;

b.      representing to Ryan that the VOYA policy would be adequately and completely funded in seven years and her Allianz annuity would then be released as collateral;

c.      representing to Ryan that she needed the VOYA policy for her family to pay taxes after she died;

40

d.     representing to Ryan that the VOYA policy was suitable for her financial needs;

e.     representing that the premium financing arrangement was suitable for Ryan; and

f.     (as to the Salisbury Defendants, NAM, and Claraphi) representing to Ryan that the high surrender charges associated with her surrendered annuities would be offset by the newer annuities.

100. These representations were false, and the Salisbury Defendants, Diyanni, NAM, and Claraphi knew these representations were false.

101. The Salisbury Defendants, Diyanni, NAM, and Claraphi intended to deceive Ryan so they could financially benefit from the transactions described herein. The Salisbury Defendants, NAM, and Claraphi intended for Ryan to act upon the misrepresentations and false information given by them so that Ryan would surrender her annuities for newer annuities that provided the Salisbury Defendants, NAM, and Claraphi with substantial commissions. The Salisbury Defendants, Diyanni, NAM, and Claraphi also intended for Ryan to act upon the misrepresentations and false information given

41

by them to induce Ryan to enter into the ILIT and premium financing arrangement to purchase the VOYA policy for their own personal gain.

102. The Salisbury Defendants, Diyanni, NAM, and Claraphi's wrongful conduct proximately caused injury to Ryan in that she detrimentally relied on these misrepresentations and incurred substantial financial losses.

103. The Salisbury Defendants, Diyanni, NAM, and Claraphi intended to cause damage to Ryan by fraudulently misrepresenting material facts to her. The Salisbury Defendants, Diyanni, NAM, and Claraphi's conduct was therefore malicious, and the Salisbury Defendants, Diyanni, NAM, and Claraphi are also guilty of oppression in that their systematic acts of fraud subjected Ryan to cruel and unjust hardship in conscious disregard of her rights. Ryan is therefore entitled to punitive or exemplary damages. As a direct and proximate result of the Salisbury Defendants, Diyanni, NAM, and Claraphi's conduct, Ryan has been damaged in an amount to be determined at trial.

///

///

## SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty as to the Salisbury Defendants, NAM, Claraphi and Diyanni)

104. Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

105. Ryan trusted and relied upon the Salisbury Defendants, NAM, and Claraphi to advise her in making and managing her investments, protecting her assets and/or entering into insurance transactions. As fiduciaries, the Salisbury Defendants, NAM, and Claraphi owed to Ryan duties including: (1) to recommend investments only after becoming sufficiently informed as to their nature, price, and financial prognosis, (2) to inform Ryan of the risks involved in purchasing particular securities, (3) to refrain from self-dealing, (4) to not misrepresent any material fact, (5) to adequately and forthrightly explain the potential risks of the investments, and (6) to act in Ryan's best interests.

106. In documents ultimately provided to Ryan, the Salisbury Defendants, and Claraphi also identify duties and responsibilities of Claraphi (and those who control and/or act on behalf of Claraphi),

43

which have been breached by the Salisbury Defendants, and/or Claraphi, including but not limited to:

a.   Defendants Claraphi and/or Salisbury were required to send statements monthly if there was activity in the account, and if not, to send statements quarterly. *See* Claraphi Advisory Network, LLC Brochure (March 15, 2018) at p. 27, attached as Exhibit A. Ryan often did not receive any documentation from Defendants Claraphi or Salisbury regarding her account.

b.   Defendant Claraphi represented that it did not receive sales commissions or special compensation for its services or recommendations. *See id.* at p. 4. As set out herein, this is untrue as both Defendant Claraphi and its employee, Salisbury, received commissions from the annuity churning scheme.

c.   Defendant Claraphi represented that it generally does not permit front-end or back-end load variable annuities to be purchased in its advisory program, or any other class of annuities with high trail fees. *See id.* at p. 12. These types of annuities may only be transferred into a Claraphi

44

account if certain requirements are met.  Yet, Claraphi permitted several of these types of annuities to be sold and surrendered at a high cost to Ryan.

d.  Defendant Claraphi represented that it adopted a Code of Ethics for all supervised persons of its firm "describing its high standard of business conduct, and fiduciary duty to its clients." *Id.* at p. 21.  Upon information and belief, Defendant Salisbury is in breach of this Code of Ethics, which Defendant Claraphi failed to enforce.

e.  Acknowledging that Defendant Claraphi "may receive benefits from relationships with recommended custodians and their affiliates," Claraphi still must, "[a]s part of its fiduciary duty to clients, . . . put the interests of its clients first." *Id.* at p. 23.  As set out herein, Defendants Claraphi and Salisbury greatly failed in this respect to put the interests of Ryan above their own.

107. Salisbury, and his companies, acted as Ryan's financial planner and investment advisor, as well as estate planning specialist and therefore assumed fiduciary duties to act on behalf of and in Ryan's best interests.  The Salisbury Defendants, NAM, and Claraphi

owed Ryan the duties of loyalty, honesty, fidelity, trust, and due care in their fiduciary obligations.

108. The Salisbury Defendants, NAM, and Claraphi violated their fiduciary duties in multiple ways and at different times by, *inter alia*:

a. unreasonably and in bad faith, refusing to give sufficient consideration to Ryan's welfare rather than their own financial interests;

b. churning Ryan's annuities;

c. failing to fully disclose the true characteristics of the annuities sold to Ryan, including the consequences of surrendering Ryan's annuities;

d. failing to fully disclose the true characteristics and nature of the premium funding arrangement and the VOYA policy to Ryan;

e. misrepresenting Ryan's net worth on the application for the VOYA policy;

f. providing Ryan with incomplete information on financial transactions, including failing to provide Ryan with complete documentation on said transactions; and

g.  requiring Ryan to sign but not date incomplete applications for financial transactions and notarizing said documents outside of Ryan's presence.

109. Defendant Diyanni violated his fiduciary duty in multiple ways and at different times by, *inter alia*:

a.  failing to perform his fiduciary duties to make an appropriate determination of the appropriateness of replacing the Columbus Life policy;

b.  failing to determine the suitability of the VOYA life insurance policy;

c.  failing to determine the suitability of the premium financing arrangement and/or to negotiate more favorable terms;

d.  putting Ryan's funds and collateral at unnecessary risk;

e.  acting with and concealing a conflict of interest;

f.  engaging in self-dealing with respect to his activities related to the Ryan; and/or

g.  charging an excessive fee and/or by failing to render adequate services commensurate with the fee charged.

110. As described herein, the Salisbury Defendants, NAM, Claraphi and Diyanni recklessly or knowingly breached their fiduciary duties by orchestrating, devising, carrying out, participating in, and/or failing to prevent, terminate, or timely correct the wrongdoing alleged herein.

111. Each of these violations was achieved because the Salisbury Defendants, NAM, Claraphi and Diyanni willingly, knowingly, and/or with recklessness sought to gain their own financial advantage to the disadvantage of Ryan.

112. As a direct and proximate result of the Salisbury Defendants, NAM, Claraphi and Diyanni's violations of their fiduciary duties, Ryan has been injured, and suffered and continues to suffer economic and non-economic losses, all in an amount to be determined at trial.

113. In addition, the wrongful acts of the Salisbury Defendants, NAM, Claraphi and Diyanni were done maliciously, oppressively, and with the intent to mislead and defraud. Ryan is therefore entitled to punitive or exemplary damages. As a direct and proximate result of the Salisbury Defendants, NAM, Claraphi and Diyanni's conduct, Ryan has been damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Vicarious Liability / Respondeat Superior as to the Salisbury Defendants, NAM, Claraphi, Diyanni, Aurora Capital, Lake Forest,  Wintrust, Security Life of Denver, and Bellini)

114. Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

115. At all times, Defendant Salisbury acted within the scope of, and in the course of his employment with, or under the direction and control of the other Defendants who retained the right to control, direct, and/or manage, including but not limited to the Salisbury Defendants, NAM, Claraphi, Aurora Capital, Lake Forest, Wintrust, and Security Life of Denver.   These other Defendants knew of and authorized Salisbury's position as an investment advisor representative and appointed agent with the ability and authority to sell the annuities and life insurance policies in question, and to orchestrate the premium financing arrangement.   Therefore, under the doctrines of vicarious liability and respondeat superior the Salisbury Defendants, NAM, Claraphi, Aurora Capital, Lake Forest, Wintrust, and Security Life of Denver are liable for the wrongful acts

committed by those under their control, direction, or management as set forth herein.

116. At all times, Defendant Diyanni acted under the direction and control of the other Defendants who retained the right to control, direct, and/or manage, including, but not limited to, Defendants Lake Forest, Wintrust, Aurora Capital, and/or Security Life of Denver. These other Defendants knew of and authorized Diyanni's position as an appointed agent with the ability and authority to serve as Trustee to the ILIT and to engage in the premium financing arrangement. Therefore, under the doctrines of vicarious liability and respondeat superior, Defendants Lake Forest, Wintrust, Aurora Capital, and/or Security Life of Denver are liable for the wrongful acts committed by those under their control, direction, or management as set forth herein.

117. At all times, Defendant Bellini acted within the scope of, and in the course of his employment with, or under the direction and control of Security Life of Denver and/or Aurora Capital who retained the right to control, direct, and/or manage. Security Life of Denver and/or Aurora Capital knew of and authorized Bellini's position as a life insurance sales agent with the ability and authority to sell the life

insurance policy in question, and to engage in the premium financing arrangement. Therefore, under the doctrines of vicarious liability and respondeat superior, Defendants Security Life of Denver and/or Aurora Capital are liable for the wrongful acts committed by those under their control, direction, or management as set forth herein.

118. Ryan suffered damages as a result and is entitled to damages and such other relief as the Court may deem appropriate.

### EIGHTH CAUSE OF ACTION
### (Violations of the Hawai'i Securities Act as to the Salisbury Defendants, NAM, and Claraphi)

119. Plaintiff adopts, re-alleges and incorporates herein the allegations in the preceding paragraphs, as though fully set forth herein.

120. As described, the Salisbury Defendants, NAM, and Claraphi advised Ryan to forego suitable investments in securities, and to instead surrender various annuities at high surrender charges for other annuities bearing similar surrender charges. The Salisbury Defendants, NAM, and Claraphi also advised Ryan to forego suitable investments in securities for the VOYA policy and to enter into the premium financing arrangement. The Salisbury Defendants, NAM, and Claraphi also received, directly or indirectly, consideration from

Ryan for providing investment advice. The Salisbury Defendants, NAM, and Claraphi violated the Hawaiʻi Securities Act (HAW. REV. STAT. §§ 485A-502, 485A-509) by employing a device, scheme, or artifice to defraud Ryan and by engaging in a course of business which operated as a fraud or deceit on Ryan.

121. The Salisbury Defendants, NAM, and Claraphi further violated HAW. REV. STAT. § 485-25(a)(2) by making untrue statements of material fact and omitting material facts, which made their statements misleading. In connection with providing investment advice to Ryan, the Salisbury Defendants, NAM, and Claraphi represented that the recommended investments and investment strategies were suitable for Ryan's financial needs and that any high surrender charges associated with the surrender of Ryan's existing annuities would be offset by the performance of other investments without disclosing the risks associated with these investments or strategies.

122. Ryan demands judgment against the Salisbury Defendants, NAM, and Claraphi for all losses incurred, all amounts paid as consideration for investment advice, interest, costs, and

attorney fees, as well as any such other further relief as this Court deems just and proper.

## NINTH CAUSE OF ACTION
**(Controlling Person Liability as to Defendants NAM and Claraphi)**

123. Plaintiff adopts, re-alleges and incorporates herein the allegations in the preceding paragraphs, as though fully set forth herein.

124. Defendants NAM and Claraphi directly or indirectly had the practical ability and power to control Defendant Salisbury. Accordingly, and as provided under HAW. REV. STAT. § 485A-509(g), Defendants NAM, Claraphi and Salisbury are liable jointly and severally to Ryan for the losses created by their wrongful conduct.

125. Defendants NAM, Claraphi and Salisbury either had conscious involvement in the impropriety that caused Ryan's damages and loss or had constructive notice of the intended impropriety. Defendants NAM, Claraphi and Salisbury had an awareness that its or his role was part of the overall activity that was improper. Thus, Defendants NAM, Claraphi and Salisbury also aided and abetted the violations and illegality alleged herein.

126. Ryan is entitled to damages and such other relief as the Court may deem appropriate.

## TENTH CAUSE OF ACTION
### (Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) as to all Defendants)

127. Plaintiff adopts, re-alleges and incorporates herein the allegations in the preceding paragraphs, as though fully set forth herein.

128. Defendants' conduct as set out herein constitutes a violation of 18 U.S.C. § 1962(c). Defendants have acted together, along with individuals and entities whose identities are currently unknown to Ryan, to conduct an enterprise through a pattern of racketeering activity. As discussed in detail herein, Defendants have intentionally participated in at least one of two schemes to defraud Ryan of her money and investments by means of material misrepresentations, omissions and half-truths. Ryan reasonably relied on these misrepresentations, omissions, and half-truths, and, as a result of such reliance, directly and proximately suffered real and specifiable damages. There is a threat of long-term racketeering activity given the extensive scope of Defendants' activities and the significant monetary gains such activities have garnered them.

Defendants use the United States Mail and the internet in furtherance of their fraudulent scheme.

129. Ryan is a "person" within the meaning of 18 U.S.C. § 1961(3). The Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

**The Alleged Associated-in-Fact RICO Enterprise**

130. The following groups of individuals and companies associated-in-fact as "enterprise[s]" within the meaning of 18 U.S.C. §1961(4) to market and sell unsuitable financial products to Ryan while concealing the true nature of the products:

    a. With respect to the VOYA policy and the premium financing arrangement associated with that policy (the "VOYA Enterprise"):

        i. Chris Salisbury;

        ii. C. Salisbury, LLC;

        iii. Accelerated Estate;

        iv. Claraphi;

        v. NAM;

        vi. Michael Diyanni;

        vii. Lake Forest;

    viii. Wintrust;

    ix.  Aurora Capital;

    x.   Security Life of Denver; and

    xi.  Alejandro Bellini.

    b.  With respect to the annuity churning scheme ("the Annuities Enterprise"):

    i.   Chris Salisbury;

    ii.  C. Salisbury, LLC;

    iii.  Accelerated Estate;

    iv.  Claraphi; and

    v.   NAM.

**Purpose**

131. The VOYA Enterprise is an ongoing and continuing organization of individuals and companies associated for the common or shared purpose of continuing to profit from the unsuitable life insurance policy and premium financing arrangement, which was designed to be deceptive and induce Ryan to enter the financial transactions with the members of the VOYA Enterprise to her detriment. The VOYA Enterprise also deceived Ryan by

concealing information related to the life insurance policy and premium financing arrangement.

132. The Annuities Enterprise is an ongoing and continuing organization of individuals and companies associated for the common or shared purpose of continuing to profit from the unsuitable annuity products as they were churned to Ryan's detriment, causing her to incur high surrender fees and forego more suitable investment opportunities. The Annuities Enterprise also deceived Ryan by concealing information related to the annuities.

**Relationships among Separate and Distinct Associates**

133. Each associate of the VOYA Enterprise and each associate of the Annuities Enterprise are separate and distinct legal entities which are free to act independently to advance their own interests, and which make their own day-to-day business decisions. To the extent that any Defendant may be a related entity of another member of the same Enterprise (i.e. a subsidiary, parent, or sister corporation), the decision to operate as separate entities facilitated the wrongful conduct in question.

134. The associates of each Enterprise are distinct from the Enterprises themselves. Each member is not conducting solely its

own affairs, but is conducting the affairs of the Enterprise aside and apart from its own affairs. The members of each Enterprise have banded together to accomplish the fraudulent scheme and pattern of racketeering activity discussed herein, which could not have been accomplished by any member alone.

**Continuous Existence**

135. The VOYA Enterprise has had an ongoing and continuous existence since shortly before the Policy Date of the VOYA IUL-Global Choice Policy (April 5, 2016) sufficient to permit Defendants to pursue the VOYA Enterprise's purpose. During this time, the VOYA Enterprise has displayed a continuity of membership and Defendants acted continuously in their respective roles in the VOYA Enterprise.

136. The Annuities Enterprise has had an ongoing and continuous existence since Ryan's engagement of Chris Salisbury as her investment advisor and his first purchase of an annuity on Ryan's behalf. Since that time, the Annuities Enterprise has displayed a continuity of membership and the Salisbury Defendants, NAM, and Claraphi acted continuously in their respective roles in the Annuities Enterprise.

## Interstate Commerce

137. The Enterprises engage in and affect interstate commerce because they involve activities across state boundaries, such as the fraudulent marketing, promotion, advertisement, sale, and management of the investment products described herein.

## Pattern of Racketeering Activity & Predicate Acts

138. This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

139. In violation of 18 U.S.C. § 1962(c), the participating Defendants of each Enterprise engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and

impacted Ryan. Therefore, the Defendants have violated 18 U.S.C. § 1962(c).

140. The multiple predicate acts of racketeering activity that Defendants committed and/or conspired to, or aided and abetted in the commission of, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) as they were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

141. For the purpose of executing and/or attempting to execute the scheme to defraud or obtain money by means of false pretenses, representations, omissions, or promises through the sale, marketing, and administration of the VOYA life insurance policy and premium financing arrangement, the VOYA Enterprise, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to, performance illustrations, applications, contracts,

correspondence, statements, premium payments, commission payments, and other materials relating to the marketing, sale, and administration of the VOYA life insurance policy and premium financing arrangement.

142. For the purpose of executing and/or attempting to execute the scheme to defraud or obtain money by means of false pretenses, representations, omissions, or promises through the sale, marketing, and administration of the VOYA life insurance policy and financing arrangement, the VOYA Enterprise, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to performance illustrations, applications, contracts, correspondence, statements, premium payments, commission payments, faxes, wire transfers, and other materials relating to the marketing, sale, and administration of the VOYA life insurance policy and premium financing arrangement. In addition, pursuant to and as part of the scheme to defraud, the members of the VOYA Enterprise intended to and did receive payments from Ryan that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. §1343.

143. For the purpose of executing and/or attempting to execute the annuity churning scheme designed to defraud or obtain money by means of false pretenses, representations, omissions, or promises, the Annuities Enterprise, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to, annuity disclosure forms, performance illustrations, applications, contracts, correspondence, statements, annuity payments, commission payments, and other materials relating to the marketing, sale, and administration of the various annuities that were churned to Ryan's detriment.

144. For the purpose of executing and/or attempting to execute the annuity churning scheme designed to defraud or obtain money by means of false pretenses, representations, omissions, or promises, the Annuities Enterprise, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to annuity disclosure forms, performance illustrations, applications, contracts, correspondence, statements,

annuity payments, commission payments, faxes, wire transfers, and other materials relating to the marketing, sale, and administration of the various annuities that were churned to Ryan's detriment. In addition, pursuant to and as part of the scheme to defraud, the members of the Annuities Enterprise intended to and did receive payments from Ryan that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. §1343.

**Injuries**

145. But for the conduct of Defendants alleged in this Complaint, Ryan would not have been injured. As it relates to the VOYA Enterprise, Ryan's injury was a foreseeable and natural consequence of the VOYA Enterprise's scheme to market, sell, and administer an unsuitable life insurance policy and premium financing plan. As it relates to the Annuities Enterprise, Ryan's injury was a foreseeable and natural consequence of the Annuities Enterprise's scheme to market, sell, and administer unsuitable annuities products to Ryan, which the associates of the Annuities Enterprise churned to Ryan's detriment.

146. The injuries of Ryan were directly and proximately caused by Defendants' racketeering activity. Reliance by Ryan on the VOYA

policy and premium financing arrangement, and on the expertise of the Defendants, allowed the Defendants to market and sell Ryan an unsuitable investment product, injuring Ryan by causing her to forfeit her suitable life insurance policy for an unsuitable policy for which she could not afford the premiums.

147. Additionally, reliance by Ryan on the Salisbury Defendants, NAM, and Claraphi's investment expertise and on the annuity products sold to Ryan by them allowed the Salisbury Defendants, NAM, and Claraphi to churn Ryan's annuities for their own financial gains, injuring Ryan by causing her to incur substantial and unnecessary surrender charges.

148. Many of the precise dates for the VOYA Enterprise and Annuities Enterprise's fraudulent uses of the U.S. Mail and wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records. Indeed, the success of both Enterprises' schemes depend upon concealment, and Defendants have withheld details of their schemes from Ryan. Generally, however, Ryan can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme. They include numerous

communications to perpetuate and maintain each scheme, including, among other things:

    a.    For the VOYA Enterprise,

        i.  Processing documents to establish the ILIT;

        ii.  processing applications for the VOYA policy;

        iii.  processing documents for the premium financing arrangement;

        iv.  processing premium payments for the policy;

        v.  accepting commissions or kick-backs from the sale of the VOYA policy and/or premium financing arrangement; and

        vi.  processing the excessive brokerage fee for Michael Diyanni.

    b.    For the Annuities Enterprise,

        i.  facilitating the applications for the numerous annuity products outlined above, including forwarding Ryan signature pages;

        ii.  facilitating the premium payments, surrender charges, and other fees for the numerous annuity products outlined above; and

      iii.  accepting commissions from the sale of the

          numerous annuity products outlined above.

149. Ryan was also injured by the overt acts taken by the Defendants in furtherance of their conspiracy to violate 18 U.S.C. § 1962(c), which are themselves predicate acts, including, with respect to the VOYA Enterprise, hiding the true nature of the premium financing arrangement by sending Ryan incomplete information regarding the transaction, and with respect to the Annuities Enterprise, hiding the true nature of the annuity churning scheme by sending Ryan only signature pages and incomplete documentation regarding the investment products.

150. As a result and by reason of the foregoing, Ryan has been injured, suffered harm and sustained damage to her property, and is therefore entitled to recover actual and treble damages, and her costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

151. In addition, as set forth above, Defendants have violated 18 U.S.C. §§ 1962(c), and will continue to do so in the future. Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18

U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962.

## ELEVENTH CAUSE OF ACTION
### (Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) as to all Defendants)

152. Plaintiff adopts, re-alleges and incorporates herein the allegations of Paragraphs 127–51.

153. This claim arises under 18 U.S.C. § 1962(d), which provides in relevant part: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section."

154. In violation of 18 U.S.C. § 1962(d), Defendants of the VOYA Enterprise conspired to defraud Ryan of her money and property through the sale of unsuitable investment products aimed at their own financial gains pursuant to the pattern of racketeering activity and the scheme described above. Defendants agreed to conduct or to participate in the affairs of the VOYA Enterprise and agreed to commit at least two of the predicate acts identified above in the Tenth Cause of Action.

155. Similarly, the Salisbury Defendants, Claraphi, and NAM violated 18 U.S.C. § 1962(d) by conspiring to defraud Ryan of her

67

money and property through the sale of unsuitable investment products aimed at their own financial gains pursuant to the pattern of racketeering activity and the scheme described above. The Salisbury Defendants, Claraphi, and NAM agreed to conduct or to participate in the affairs of the Annuities Enterprise and agreed to commit at least two of the predicate acts identified above in the Tenth Cause of Action.

156. The injuries of Ryan were directly and proximately caused by Defendants' racketeering activity. Reliance by Ryan on the VOYA policy and premium financing arrangement, and on the expertise of the Defendants, allowed the Defendants to market and sell Ryan an unsuitable investment product, injuring Ryan by causing her to forfeit her suitable life insurance policy for an unsuitable policy for which she could not afford the premiums.

157. Additionally, reliance by Ryan on the Salisbury Defendants, NAM, and Claraphi's investment expertise and on the annuity products sold to Ryan by them allowed the Salisbury Defendants, NAM, and Claraphi to churn Ryan's annuities for their own financial gains, injuring Ryan by causing her to incur substantial and unnecessary surrender charges.

158. As a result and by reason of the foregoing, Ryan has been injured, suffered harm and sustained damage to her property, and is therefore entitled to recover actual and treble damages, and her costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

159. In addition, as set forth above, Defendants have violated 18 U.S.C. §§ 1962(c) and (d), and will continue to do so in the future. Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962.

## TWELFTH CAUSE OF ACTION
### (Violation of HAW. REV. STAT. § 842-2(3) as to all Defendants)

160. Plaintiff adopts, re-alleges and incorporates herein the allegations of Paragraphs 127–59.

161. This claim arises under HAW. REV. STAT. § 842-2(3), which provides in relevant part: "It shall be unlawful . . . [f]or any person employed by or associated with any enterprise to conduct or participate in the conduct of the affairs of the enterprise through racketeering activity . . . ."

69

162. In violation of HAW. REV. STAT. § 842-2(3), Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the VOYA Enterprise through a "racketeering activity," as defined in HAW. REV. STAT. § 842-1.

163. Specifically, Defendants engaged in "racketeering activity" by committing or aiding and abetting in the commission of at least one act of racketeering activity, i.e., violations of the Hawaiʻi Unfair and Deceptive Acts Trade Practices Act as explained in Paragraphs 64–90, within the past three years. Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted Ryan. Therefore, the Defendants have violated HAW. REV. STAT. § 842-2(3).

164. The injuries of Ryan were directly and proximately caused by Defendants' racketeering activity. Reliance by Ryan on the VOYA policy and premium financing arrangement, and on the expertise of the Defendants, allowed the Defendants to market and sell Ryan an unsuitable investment product, injuring Ryan by causing her to forfeit her suitable life insurance policy for an unsuitable policy for which she could not afford the premiums.

165. In violation of HAW. REV. STAT. § 842-2(3), the Salisbury Defendants, NAM, and Claraphi have conducted or participated, directly or indirectly, in the conduct of the affairs of the Annuities Enterprise through "racketeering activities," as defined in HAW. REV. STAT. § 842-1.

166. Specifically, the Salisbury Defendants, NAM, and Claraphi engaged in "racketeering activity" by committing or aiding and abetting in the commission of at least three acts of racketeering activity, i.e., violations of the Hawaiʻi Securities Act and the Hawaiʻi Unfair and Deceptive Acts Trade Practices Act as explained in Paragraphs 64–90 and 119–22 as well as HAW. REV. STAT. § 708-830(2). Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted Ryan. Therefore, the Salisbury Defendants, NAM, and Claraphi have violated HAW. REV. STAT. § 842-2(3).

167. HAW. REV. STAT. § 708-830(2) states that "[a] person commits theft if the person does any of the following . . . Property obtained or control exerted through deception. A person obtains, or

exerts control over, the property of another by deception with intent to deprive the other of the property."

168. The Salisbury Defendants, NAM, and Claraphi obtained or exerted control of Ryan's property by causing Ryan to sacrifice portions of her investments through substantial surrender charges and the premature surrender of her annuities so that the Salisbury Defendants, NAM, and Claraphi could receive commissions off of the next annuity product churned to Ryan's detriment. The Salisbury Defendants, NAM, and Claraphi intended to deprive Ryan of her property by fraudulently suppressing material information from her as outlined in Paragraphs 91–97 and misrepresenting material information as outlined in Paragraphs 98–103. The Salisbury Defendants, NAM, and Claraphi also intended to deprive Ryan of her property by having her sign financial documents surrendering her rights in annuity products and transferring her interests into other annuity products without providing her complete information regarding the annuity products, including failing to disclose that the Salisbury Defendants, NAM, and Claraphi would financially benefit by these transactions to Ryan's detriment.

169. The injuries of Ryan were directly and proximately caused by the Salisbury Defendants, NAM, and Claraphi's racketeering activity. Reliance by Ryan on the Salisbury Defendants, NAM, and Claraphi's investment expertise and on the annuity products sold to Ryan by them allowed the Salisbury Defendants, NAM, and Claraphi to churn Ryan's annuities for their own financial gains, injuring Ryan by causing her to incur substantial and unnecessary surrender charges.

170. As a result and by reason of the foregoing, Ryan has been injured, suffered harm and sustained damage to her property, and is therefore entitled to recover damages and her costs of suit, including reasonable attorney fees, pursuant to HAW. REV. STAT. § 842-8(c).

171. In addition, as set forth above, Defendants have violated HAW. REV. STAT. § 842-2(3), and will continue to do so in the future. Enjoining Defendants from committing these violations in the future and/or declaring their invalidity is appropriate pursuant to HAW. REV. STAT. § 842-8(a).

///

///

///

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff requests relief as follows:

    a. compensatory damages in an amount to be proven at trial;

    b. statutory, treble, and/or punitive damages as to Counts for which they are available under the applicable law in such amount as the Court deems just and proper;

    c. pre-and post-judgment interest at the maximum rate allowed by law;

    d. attorney's fees;

    e. costs of litigation;

    f. disgorgement;

    g. rescission of the VOYA policy as well as the agreements associated with the premium financing arrangement;

    h. a refund of the premiums paid on the VOYA policy plus interest;

    i. injunctive relief pursuant to 18 U.S.C. § 1964(a) and/or HAW. REV. STAT. § 842-8(a); and/or

///
///

j. such other legal and equitable relief as the Court deems
proper.

DATED: Honolulu, Hawaiʻi, October 23, 2018.


 /s/ MELINDA WEAVER
MARGERY S. BRONSTER
MELINDA WEAVER

Attorneys for Plaintiff
KATHY RYAN INDIVIDUALLY AND IN
HER CAPACITY AS TRUSTEE OF
THE BRODY FAMILY TRUST